**Robert F. WOLF et al., Appellants,**

v.

**James SCHABEN, Appellee.**

**No. 16186.**

United States Court of Appeals
Eighth Circuit.

Dec. 17, 1959.

Frederick S. Cassman, Omaha, Neb., presented oral argument for appellants.

William H. Welch, Logan, Iowa, made argument for appellee.

Before GARDNER, VOGEL and MATTHES, Circuit Judges.

VOGEL, Circuit Judge.

Appellants herein brought action against the appellee for the conversion of cattle. Diversity of citizenship and more than the statutory amount make for federal court jurisdiction. The law of the State of Nebraska is controlling. Trial of the case was begun before the Honorable John W. Delehant of Nebraska, who was serving by assignment in the United States District Court for the Southern District of Iowa. When the trial neared completion, Judge Delehant declared a mistrial because of the introduction before the jury of evidence of practices in the buying of purebred Angus cattle "which the law does not propose, and which are not valid". Subsequently the case came before the Honorable Edwin R. Hicklin. Based upon the pleadings, depositions, affidavits and the evidence adduced at the former trial, appellee moved for summary judgment. The trial court granted the motion in an order stating:

"Thereafter, and on April 10, 1958, defendant filed a Motion for Summary Judgment, in which he incorporated by reference all the pleadings, depositions and evidence adduced at the former trial of the case. Said Motion was argued orally before this Court, and this Court has had the use and benefit of the transcript of the proceedings in the former trial.

"This Court agrees with the opinions expressed by Judge Delehant at the former trial to the effect that there is no valid custom which would apply to all buyers of purebred cattle. Without any such binding custom, the plaintiffs have presented no evidence upon which they might recover from defendant.

"If this case were re-tried, and the same evidence adduced as in the former trial with this Court prohibiting the introduction of evidence as to custom, it is the opinion of this Court that it would be compelled to direct a verdict for the defendant."

From this ruling appeal to this court has been taken.

█ A recitation of the facts is necessary to an understanding of the problem presented. In the fall of 1954, the appellants, who were engaged in the business of cattle ranching near Albion, Nebraska, purchased a number of purebred registered Angus heifers from Gambrel and Gambrel, breeders in New Mexico. Appellants thereafter advertised the cattle for sale. In the latter part of April, 1955, one Edward A. Pulliam visited appellants' ranch and inspected the cattle but did not purchase them. In early May Pulliam telephoned appellants and requested that they drive to his farm to discuss the disposition of the heifers. On May 6, 1955, appellants conferred with Pulliam and stated that they did not want to ship the cattle to Pulliam under any arrangement whereby they might have to take them back at some later date. Accordingly, on May 9, 1955, the appellants and Pulliam executed the following instrument:

"Plaintiffs' Exhibit 1.

"This Agreement made this 9th day of May, 1955, by and between E. A. Pulliam of Route 7, Benson Station, Omaha, Nebraska, hereafter called Buyer, and Wolf Brothers & Reich of Albion, Nebraska, hereafter called Seller, Witnesseth:

"1. Seller has delivered 57 Purebred Registered Angus Heifers to Buyer at his farm. 51 of these heifers are branded 6 on the left shoulder or left rib, and 6 are branded on the right hip. Buyer agrees to pay for these heifers on or before August 8, 1955 at the rate of $175.00 per head for 53 heifers and $150.00 per head for 4 heifers. Title to the heifers shall remain in

Seller until the heifers have been paid for in full.

"2. In consideration of the above-stated delay in payment, and until the heifers are paid for in full, Buyer agrees to:

"a. Take good care of the heifers at no cost to Seller.

"b. Insure the heifers against loss due to windstorm, hail, fire and lightning; and, if a heifer dies from uninsured cause, to furnish proper proof of loss such as the branded portion of the hide or ears containing tattoos.

"c. It is Buyer's intention to sell part or all of these heifers between May 9, 1955 and August 8, 1955, in which event, Buyer agrees to remit the proceeds to Seller, as the heifers are sold, and if the sale price of any heifer is more than Buyer's cost plus $25.00 per head, the excess shall be divided equally between Buyer and Seller. Upon receipt of the proceeds and transfer fee, Seller will make application for transfer of pedigree per Buyer's order.

        "E. A. Pulliam
             "Buyer
   "Wolf Brothers & Reich by
      "James M. Wolf
             "Seller"

Pursuant to the foregoing, 57 heifers were transported by appellants to the Pulliam farm. On May 16, 1955, the appellee, a livestock auctioneer, visited the Pulliam farm and inspected the cattle. Pulliam agreed to sell the entire lot to the appellee for $120.00 per head. Pulliam advised the appellee that the cattle came from New Mexico; that peo-

ple in Albion had first purchased them; and that he had taken them in as payment for a couple of cars of fertilizer. He represented himself as the sole owner and stated that they were Bangs vaccinated and registered. He promised the appellee that he would obtain for him the vaccination papers from the previous owners at Albion. Appellee paid Pulliam a total of $6,840.00 for the cattle. Several days later Pulliam received the Bangs vaccination records and five-generation pedigree tabulations from the appellants by mail which he subsequently transferred to the appellee. Pulliam paid nothing to appellants, who now claim to have been the owners of the cattle and contend that the appellee converted them to his own use and demand judgment against him in the amount of $9,875.00.

It is clear, and the parties so agree, that the primary issue to be determined is what relationship existed between the appellants and Pulliam. Appellants contend that the relationship was one of principal and agent and that, consequently, Pulliam could not convey title to appellee in any transaction carried out contrary to the terms of the express agreement. Appellee, however, asserts that the agreement constituted an unrecorded conditional sales contract so that, under Nebraska law [1] any reservation of title in the appellants was void as against the appellee. It is apparent that the trial court construed the instrument as a conditional sales contract. In so doing, we believe it was entirely correct.

The agreement was drawn by James M. Wolf, one of the appellants, who is a licensed attorney in the State of Ne-

---

1. Chapter 36–207, Revised Statutes of Nebraska, 1943, as Amended, provides:
    "*Sale, lease, or contract upon conditions; condition void, when; vendee or lessee nonresident, filing required.* Where a vendee or lessee of personal property, except motor vehicles, obtains actual possession pursuant to a contract of sale or lease containing a stipulation which makes the transfer of title or ownership depend on any condition, such stipulation shall not be valid against any purchaser, judgment creditor or mortgagee of the vendee or lessee without notice of such stipulation unless the said contract or lease be in writing signed by the vendee or lessee and said contract or lease or a copy thereof be filed in the office of the clerk of the county within which such vendee or lessee resides, or if the vendee or lessee is a nonresident of the state in the office of the clerk of the county where the property is located."

braska. Throughout it refers to Pulliam as "buyer" and appellants as "seller". Further, like a conditional sales contract, the instrument was recorded by appellants but not until some four months after the sale by Pulliam to appellee. Moreover, unlike a mere agency agreement, there were no circumstances under which the cattle were to be returned to the appellants and in all events the buyer Pulliam was to pay for the heifers not later than August 8, 1955.

The general rule for distinguishing between a conditional sale and a consignment or agency contract is stated in 47 Am.Jur., p. 27, Sales, § 837, as follows:

"The test usually applied is whether or not the buyer or consignee is obligated, at all events, to pay the purchase price of the subject matter of the contract. If he is, in a majority of the cases the contract is construed to be one of conditional sale, and not a consignment contract. * * *"

This rule has been followed in Nebraska. In National Cordage Co. v. Sims, 1895, 44 Neb. 148, 62 N.W. 514, 515, the court found a consignment to exist after observing that:

"The distinction between conditional sales and consignments of personal property is frequently overlooked by text writers as well as judges. Perhaps no sounder definition of a conditional sale is to be found in the books than that approved by Mr. Newmark in his valuable work on the Law of Sales (section 19): 'Whenever it appears from the contract that the owner of personal property has transferred the possession thereof to another reserving to himself the naked title, solely for the purpose of securing payment of the price agreed upon between them, the contract is necessarily a conditional sale, and not a bailment.' Such an agreement is obviously within the provisions of our registration laws, and must be

filed in order to protect the seller against purchasers and execution creditors without notice of the vendee in possession. * * *

" * * * There is in the contract here involved no suggestion whatever of the relation of vendor and vendee, or of facts from which Yoder could acquire title to the twine in controversy upon the happening of contingencies near or remote." (Emphasis supplied.)

Subsequently, in D. M. Osborne & Co. v. Plano Mfg. Co., 1897, 51 Neb. 502, 70 N.W. 1124, 1125, the court distinguished National Cordage Co. v. Sims, supra, on the grounds that there, "the agent by the contract did not agree to pay for all twine received by him * *", and found a conditional sales contract because, "In the contract in the case at bar Wyman expressly agrees to pay for all twine shipped to him under the contract;". See also, Racine-Sattley Co. v. Meinen, 1908, 79 Neb. 33, 114 N.W. 602; Mack v. Drummond Tobacco Co., 1896, 48 Neb. 397, 67 N.W. 174. We accordingly sustain the trial court's ruling that the instrument in question constituted a conditional sales contract.

Appellants, however, contend that, even if the agreement be so deemed, appellee cannot avail himself of the recording statute as he was not a "purchaser * * without notice" as is required for protection thereunder. In support of this contention appellants allege that the heifers were branded cattle and that appellee failed to get a bill of sale from Pulliam as is required by the Nebraska Brand Law;[2] that appellee did not demand or receive the purebred registration statements, contrary to the practice and custom in the purebred registered Angus business, which statements would have showed appellants as owners; that the vaccination certificates which appellee did receive revealed appellants' ownership; and that the price paid by appellee to Pulliam was sufficiently below the cattle's market value so as to put appellee

2. Sections 54–116, 54–118, Revised Statutes of Nebraska, 1943.

on inquiry of Pulliam's alleged ownership.

 We cannot agree with appellants that appellee failed to qualify under the statute as a "purchaser \* \* \* without notice". The cattle carried only the brand of Gambrel and Gambrel. They were not branded by the appellants nor were any brands recorded by them. Thus, appellants are not in a position to invoke the requirements of the Brand Law, as

> "The statute was enacted for the protection of the *owners* of the brands and was not intended to prohibit private sales or trades between individuals." (Emphasis supplied.) Bendfeldt v. Lewis, 1948, 149 Neb. 107, 30 N.W.2d 293, 295.

In respect to the registration statements, nothing justifies the conclusion that it was the established practice of the business to receive those statements at the time of the purchase. Persuasive evidence that such was not the custom appears in the record in that appellants, themselves, did not receive the registrations until some time after their purchase of the cattle from Gambrel and Gambrel. As to the vaccination certificates, the record clearly shows that appellee requested them at the time of the sale but did not actually receive them until sometime thereafter. Finally, the sole testimony substantiating appellants' claim that the price paid by appellee was below the market value was the opinion of one of appellants. Pulliam, however, testified that the only other offers he received for the cattle were $115.00 per head for the complete lot and an offer for $150.00 per head for five head provided that the offeror could select them from the entire herd. Appellee did make inquiry of one Zimmerman as to whether there were any liens, mortgages or other clouds on Pulliam's title and was informed that a check of the records in the county clerk's office revealed none. We, therefore, conclude that appellee was clearly a "purchaser \* \* \* without notice".

Lastly, the appellants attack the granting of summary judgment, quoting Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A., and citing from this court Kennedy v. Bennett, 8 Cir., 1958, 261 F.2d 20, and Severson v. Fleck, 8 Cir., 1958, 251 F.2d 920. We think the undisputed facts herein meet the requirements of Rule 56 and its interpretation by this court in the above cases and that the appellee was entitled to summary judgment beyond all doubt. Had the case again gone to trial, the trial court would have been compelled to direct a verdict for the appellee as Judge Hicklin stated in his order granting the motion. We have considered all points raised by the appellants and find them to be without merit.

Affirmed.